# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____

|  |  |
|---|---|
| | ) |
| | ) |
| **JEROME TIBBS,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )    **Civil Action No. 13-11095-DJC** |
| | ) |
| | ) |
| **REBEKAH E. SAMUELS, et al.,** | ) |
| | ) |
| **Defendants.** | ) |
| | ) |
| | ) |
| | ) |

_____)

## MEMORANDUM AND ORDER

**CASPER, J.**                                                                                          **March 28, 2017**

## I.      Introduction

Plaintiff Jerome Tibbs ("Tibbs") brings this lawsuit against Rebekah E. Samuels ("Samuels"), William H. Roach ("Roach"), Paul A. Marrone ("Marrone"), Jennifer Sanderson ("Sanderson"), Kurt DeMoura ("DeMoura"), Mark Reilly ("Reilly"), Edward M. Mack ("Mack"), Dinarte V. Rego ("Rego"), Robert E. Stork ("Stork"),  John Doe I a/k/a Officer Borges ("Borges"), all officers of the Massachusetts Department of Corrections ("DOC"); James Saba ("Saba"), superintendent of the Massachusetts Correctional Institution, Cedar Junction ("Cedar Junction"); and Luis S. Spencer ("Spencer"), former commissioner of the DOC (collectively, the "Defendants").   D. 14 ¶¶ 2-14.   The Defendants have moved for summary judgment on the remaining claims against them.  D. 124.  For the reasons discussed below, the Court ALLOWS IN PART and DENIES IN PART the Defendants' motion.

## II.     Standard of Review

The Court grants summary judgment where there is no genuine dispute as to any material fact and the undisputed facts demonstrate that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  "A fact is material if it carries with it the potential to affect the outcome of the suit under the applicable law."  Santiago–Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000) (quoting Sánchez v. Alvarado, 101 F.3d 223, 227 (1st Cir. 1996)) (internal quotation mark omitted).  The movant "bears the burden of demonstrating the absence of a genuine issue of material fact."  Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir. 2000); see Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  If the movant meets his burden, the non-moving party "may not rest upon mere allegations or denials [in] his pleading[s]," Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986), but "must, with respect to each issue on which [he] would bear the burden of proof at trial, demonstrate that a trier of fact could reasonably resolve that issue in [his] favor," Borges ex rel. S.M.B.W. v. Serrano-Isern, 605 F.3d 1, 5 (1st Cir. 2010).  "As a general rule, that requires the production of evidence that is 'significant[ly] probative.'"  Id. (quoting Anderson, 477 U.S. at 249) (alteration in original).  The Court "view[s] the record in the light most favorable to the nonmovant, drawing reasonable inferences in his favor."  Noonan v. Staples, Inc., 556 F.3d 20, 25 (1st Cir. 2009).

## III.     Factual Background

The Court draws the following facts from the Defendants' statement of material facts, D. 127, Tibbs's opposition to the Defendants' motion for summary judgment,[1] D. 135, and supporting documents and these facts are undisputed unless otherwise noted.[2]

At all relevant times, Tibbs was an inmate in the custody of the DOC.  D. 127-1 at 2. Spencer was the DOC Commissioner, but he retired from his position in 2014.  Id. at 27.  Saba was the Superintendent of Cedar Junction.  Id. at 31.  Samuels, Sanderson, Stork, and DeMoura were all DOC sergeants at Cedar Junction.  Id. at 35, 49, 64, 131.  Roach, Marrone, and Borges were DOC officers at Cedar Junction.  Id. at 40, 44, 70.  Reilly was a captain at Cedar Junction. Id. at 54.  Rego and Mack were both lieutenants at Cedar Junction.  Id. at 58, 61.

On January 28, 2013, while housed in the Special Management Unit ("SMU") in Ten Block at Cedar Junction, Samuels issued Disciplinary Report 273635 against Tibbs alleging that she had observed Tibbs "trash" his cell with pudding and Styrofoam cups.  Id. at 73.  Disciplinary Report 273635 was reviewed by Samuels's Supervisor, Lieutenant Mack, Shift Commander Jeffrey M. Grimes, and Disciplinary Officer DeMoura.  Id.  Tibbs pled guilty to the report on February 4, 2013.  Id. at 4, 73.  Tibbs, however, claims that the January 28 incident occurred because Samuels making unwanted sexual advances to him.  D. 137 at 38-41.  On January 31, 2013—three days after Disciplinary Report 273635 issued—Tibbs filed a formal grievance (Grievance 64173) attesting to the alleged unwanted sexual advances by Samuels. D. 127-1 at 84.  Tibbs also claimed

---

[1] Tibbs did not file a separate Rule 56.1 statement of facts.  The Court, however, has considered his opposition to the motion for summary judgment and his affidavit and exhibits, to the extent that they contained specific, admissible facts, D. 135-40, in determining whether a disputed issue of fact remains as to the remaining claims against the Defendants.

[2] The Court ALLOWS *nunc pro tunc* both the Defendants' motion for leave to file excess pages, D. 125, and Tibbs's motion for extension of time to file a response to the motion for summary judgment, D. 132.  The Court considered the parties' various filings in resolution of the Defendants' motion for summary judgment.

in the same grievance, and in an affidavit submitted to this Court, that Samuels threatened him, took his property, spit on his sheets and destroyed his eyeglasses when he rebuffed her advances. D. 127-1 at 84; D. 136 ¶ 4.  According to Tibbs, Samuels threatened that she would set Tibbs up "to get a new case" (i.e., frame him so that he would be disciplined further and potentially have his prison sentence lengthened) and that he better hope he goes home soon (as he was scheduled to be released).  D. 127-1 at 84; D. 136 ¶ 4.

Grievance 64173 was filed with Sergeant Stork, the Institutional Grievance Coordinator, D. 127-1 at 84, who then referred it to Superintendent Saba's office.  Id. at 65.  Saba then assigned Special Investigator Scott Black to conduct an investigation about the allegations encompassed in the grievance.  Id. at 85.[3]  Following the completion of the investigation, Black concluded that Tibbs's allegations against Samuels in Grievance 64173 were not sustained.  Id. at 90.  That is, there was insufficient evidence to either prove or disprove the claims.  Id.  The grievance was then referred back to Stork who formally denied it.  Id. at 66, 84.

While the grievance investigation was pending, however, Tibbs and Samuels were involved in a separate—but allegedly related—incident. D. 136 ¶¶ 24-27.  On February 12, 2013, Marrone and Roach escorted Tibbs from his cell in the SMU in Ten Block to the medical triage unit, which is located two flights up from Tibbs's cell. D. 127-1 at 8-9.  A landing area in the middle of the stairs separates the two floors.  Id. at 9.  At some point during the medical examination, Samuels—who was in the vicinity of the medical unit—switched places with Roach.

---

[3] Because the grievance contained allegations of staff misconduct on the part of Sergeant Samuels, DOC regulations require that "[u]pon receipt of an inmate complaint of staff misconduct, the Superintendent, Department Head/Division Head, or his/her designee shall conduct an inquiry into the alleged misconduct and if the elements of the misconduct meet the requirements of either a Category I or Category II complaint, an Investigation Intake Form Shall be submitted to the Internal Affairs Unit." D. 127-1 at 93.

D. 136 ¶¶ 25, 27.  That is, Marrone and Samuels were present during Tibbs's medical evaluation and Roach was no longer in the triage unit.  Id.  During the medical examination, which involved the nurse popping some sort of skin condition on Tibbs, Tibbs asked the nurse if she "was into S and M" and whether she "like[d] popping things."  D. 127-1 at 8, 10, 101.  After this exchange, Samuels ended the medical examination.  Id. at 36, 101.  Tibbs was then removed from the triage unit and escorted down the first flight of stairs toward his cell.  Id. at 36, 46.

There is a dispute regarding what occurred during the transport of Tibbs from the medical unit to his cell.  Officers Samuels and Marrone claim Tibbs suddenly turned and head butted Sergeant Samuels's shoulder and then began to struggle with both Samuels and Marrone.  Id. at 36, 46, 101.  According to this account, Samuels and Marrone called out an emergency code and other officers, including Officer Roach, responded to subdue Tibbs.  Id. at 36, 109.  To gain control over Tibbs as he struggled, the officers pushed Tibbs against the wall, then to the ground, where additional restraints were placed on his legs by Officer Roach.  Id. at 36-37.  Tibbs, however, provides a different account of the events that transpired.  He submits that while being escorted back to his cell by Marrone, Samuels called out from the second floor and told Marrone to stop walking.  D. 136 ¶ 27.  At this point, Marrone and Tibbs were standing on the landing between the first and second floors.  Id.  Samuels then charged down the stairs and attacked Tibbs.  Id.  This attack was unprovoked.  Id.  Following the attack, Tibbs "witnessed" Samuels "coach[ ]" both Roach and Marrone about what to write in the incident reports they would be submitting to the DOC.  Id. ¶ 31.

Samuels filed Disciplinary Report 274610 against Tibbs for the February 12, 2013 altercation.  D. 127-1 at 101.  This report was reviewed by Sergeant Samuels's supervisor and a shift commander on February 12, 2013.  Id. at 102.  It was also reviewed by Disciplinary Officer

DeMoura on February 13, 2013, who, pursuant to applicable regulations, assigned the report a number of offenses. Id. at 102, 133-34. Because of the nature of these offenses and the potential of a sentence to the Department Disciplinary Unit ("DDU"), the DOC scheduled a DDU hearing. Id. at 79. The DOC placed Tibbs on awaiting action status in the Special Management Unit ("SMU") in Ten Block and received notice of the DDU hearing date of May 1, 2013. Id. at 18, 80. In preparation for the disciplinary hearing, Tibbs filed a Request for Representation and/or Witness Form, as well as an Evidence Requested by Inmate Form. Id. at 138-39. Tibbs was provided with everything he requested with the exception of photos and video, as they did not exist, and log records from Ten Block showing what time a specific staff member signed in to work, as his name was not listed on the log. Id. at 140. He was also denied his witness request because the witness could not be identified. Id.

The DOC appointed Sanderson as the Special Disciplinary Officer for the hearing and Captain Reilly served as the Special Hearing Officer ("SHO"). Id. at 51-52, 56. As Special Disciplinary Officer in the matter, Sanderson presented the case at the hearing against Tibbs. Id. at 51-52, 56, 81-82. After considering the evidence, Reilly found Tibbs guilty of Offense 2-03, Assault on a Staff Member, Contract Employee or Volunteer, and dismissed all other charges as duplicative. D. 142-44. Tibbs was sanctioned with sixteen months in the DDU. Id. at 144. Tibbs appealed this decision, id. at 150-52, but his appeal was ultimately denied, id. at 153.

## IV. Procedural History

Tibbs brought this action against the Defendants on April 26, 2013. D. 1. The Defendants initially moved for a judgment on the pleadings. D. 56. The Court allowed the motion as to a number of claims and dismissed some of the counts. D. 87. The parties proceeded with discovery.

Defendants have now moved for summary judgment as to the remaining claims.  D. 124.  The Court heard the parties on the pending motions and took the matter under advisement.  D. 144.

## V.    Discussion

### A.    Retaliation and Conspiracy Claims (Counts I & XI)

#### 1.    Count I:  Retaliation in Violation of the First Amendment

Tibbs claims Samuels, Roach, Marrone, Rego and Mack retaliated against him for filing of Grievance 64173.  D. 14 ¶¶ 20, 57-62.  Specifically, Tibbs claims that as a result of the grievance, Samuels "unlawfully assaulted, battered, and used force against [him]," and that Roach and Marrone subsequently filed false disciplinary reports to justify Samuels's conduct.  Id. ¶¶ 58-59.  As for Rego and Mack, Tibbs claims they retaliated against him by destroying property in his cell.  Id. ¶¶ 46-48, 60.  To prevail on a retaliation claim, Tibbs must show that "1) he engaged in constitutionally protected conduct, 2) prison officials took adverse action against him, 3) with the intent to retaliate against him for engaging in the constitutionally protected conduct and 4) he would not have suffered the adverse action 'but for' the prison officials' retaliatory motive."  Schofield v. Clarke, 769 F. Supp. 2d 42, 46-47 (D. Mass. 2011); see McDonald v. Hall, 610 F.2d 16, 18 (1st Cir. 1979).

Tibbs has demonstrated that he engaged in constitutionally protected conduct. The undisputed facts demonstrate that on January 31, 2013, Tibbs filed Grievance 64173 alleging that Samuels made unwanted sexual advances toward him and, when he rebuffed those advances, she threatened him, took his property, spit on his sheets, and broke his eyeglasses. D. 127-1 at 84. The Defendants do not challenge the fact that the filing of the grievance is protected activity. Indeed, such a challenge would be futile. See Hannon v. Beard, 645 F.3d 45, 48 (1st Cir. 2011) (concluding that in a retaliation case filing a grievance is "plainly . . . protected activity"); Graham v. Henderson, 89 F.3d 75, 80 (2d Cir. 1996) (noting that "retaliation against a prisoner for pursuing a grievance violates the right to petition government for the redress of grievances guaranteed by the First and Fourteenth Amendments").

To establish the remaining three elements, Tibbs must show that he suffered an adverse action as a result of engaging in this protected activity and that such adverse action would not have happened "but for" the officers' retaliatory motive. McDonald, 610 F.2d at 18. An action is considered "adverse" for retaliation purposes if it would "deter a person of ordinary firmness" from exercising the right at stake. Bart v. Telford, 677 F.2d 622, 625 (7th Cir. 1982). Because it is particularly difficult to obtain direct evidence of a retaliatory state of mind, a plaintiff can satisfy this element by introducing circumstantial evidence that supports a reasonable inference of such retaliatory motive. See Beauchamp v. Murphy, 37 F.3d 700, 711 (1st Cir. 1994) (Bownes, J., dissenting); Ferranti v. Moran, 618 F.2d 888, 892 (1st Cir. 1980). Such circumstantial evidence may include the temporal proximity between the plaintiff's exercise of his right and the defendant's alleged retaliatory act. LaFauci v. N.H. Dep't of Corr., No. Civ. 99–597–PB, 2005 WL 419691, at *7 (D.N.H. February 23, 2005) (citing Ferranti, 618 F.2d at 892; McDonald, 610 F.2d at 18); see Colon v. Coughlin, 58 F.3d 865, 872 (2d Cir.1995). Still, "[t]he mere chronology

alleged in the complaint, while sufficient to withstand a motion to dismiss, cannot get plaintiff to the jury once defendants have produced evidence of a legitimate reason" for their conduct. Layne v. Vinzant, 657 F.2d 468, 476 (1st Cir. 1981).

The Court also recognizes that "certain threats or deprivations are so de minimis that they do not rise to the level of being constitutional violations." Thaddeus-X v. Blatter, 175 F.3d 378, 398 (6th Cir. 1999) (en banc). Adverse acts are considered *de minimis* when they "cause an inmate only a 'few days of discomfort,' impose 'a [single] minor sanction,' or impose an otherwise constitutional restriction on the inmate." Starr v. Dube, 334 Fed. Appx. 341, 342 (1st Cir. 2009) (unpublished) (quoting Morris, 449 F.3d at 685–86) (alteration in original). "In making this determination, the court's inquiry must be 'tailored to the different circumstances in which retaliation claims arise,' bearing in mind that '[p]risoners may be required to tolerate more . . . than average citizens, before a [retaliatory] action taken against them is considered adverse.'" Davis v. Goord, 320 F.3d 346, 353 (2d Cir. 2003) (quoting Dawes v. Walker, 239 F.3d 489, 493 (2d Cir. 2001)) (alterations in original).

Here, Tibbs attests that in retaliation for his filing of Grievance 64173, Samuels beat him and Marrone and Roach helped Samuels cover up this beating. D. 136 ¶¶ 27-34. The Defendants and Tibbs agree that on February 12, 2013, Tibbs was present in the medical triage unit to undergo medical treatment for an unrelated issue. D. 136 ¶ 24; D. 127-1 at 101. At some point, Tibbs's medical treatment visit was terminated and he was escorted back to his cell. D. 136 ¶ 27; D. 127-1 at 101. The reason for the termination of the medical visit is disputed. Compare D. 127-1 at 101 with D. 136 ¶¶ 27-29. Regardless, both sides agree that during the Defendants' escort of Tibbs back to his cell, some sort of altercation occurred. Defendants state that Tibbs suddenly turned and head butted Samuels's shoulder and then began to struggle with both Samuels and Marrone.

D. 127-1 at 109, 111.  Samuels called for Roach, who assisted in restraining Tibbs.  Id. at 109.

Defendants state that during the altercation it was necessary to force Tibbs to the ground in order

to control him.  Id. at 109, 111.

Tibbs, however, disputes the account put forth by the Defendants.  D. 136 ¶¶ 24-27.

Instead, he attests that no provocation preceded the Defendants' use of force.  D. 136 ¶ 27.  Rather,

Tibbs states that at the time of the attack, Tibbs and Marrone were on a flight of stairs below

Samuels and that Samuels instructed Marrone to pause in place rather than continuing to escort

Tibbs to his cell.  Id.  According to this account, Samuels then ran down the stairs and battered

him.  Id.; D. 127-1 at 11.  Tibbs further claims that following the incident he observed Samuels

coaching to Roach and Marrone what to write in their incident reports.  D. 136 ¶ 31.  While Tibbs

has admitted that he did not recall the details of what Samuels instructed Roach and Marrone to

write in their "false" reports, he did recall hearing her tell them what to write.  D. 127-1 at 15.  The

reports ultimately filed by Samuels, Roach, and Marrone were consistent with one another, but not

with Tibbs's account.  D. 136 ¶¶ 32, 34.

The Court is aware that "[c]ourts properly approach prisoner retaliation claims 'with

skepticism and particular care' because 'virtually any adverse action taken against a prisoner by a

prisoner official—even those otherwise not rising to the level of constitutional violation—can be

characterized as a constitutionally proscribed retaliatory act."  Davis v. Goord, 320 F.3d 346, 352

(2d Cir. 2003).  The Court is also aware that it may not make credibility determinations at the

summary judgment stage.  While Defendants argue that "[t]he only evidence produced by Tibbs .

. . is his own self-serving deposition testimony," D. 126 at 6, Defendants have also relied heavily

on their own affidavits to support their version of what transpired.  In putting forth a retaliation

claim, "direct proof of a retaliatory motive is not essential."  Hannon, 645 F.3d at 49.  Temporal

proximity between the protected act of filing a grievance and the adverse action of an alleged attack on the inmate by the same officer against whom the grievance was filed may lend credence to the allegation that the adverse action was a form of retaliation.  See LaFauci, 2005 WL 419691, at *7.  Here, less than two weeks passed between Tibbs filing Grievance 64173 and the altercation that occurred between Tibbs and Samuels, Roach and Marrone.  Thus, in light of the inherent factual disputes about what happened on February 12, 2013, the Court will not grant summary judgment on the retaliation claim with respect to Defendants Samuels, Marrone or Roach.

Tibbs also asserts a retaliation claim against Mack and Rego.  D. 14 ¶ 60.  Specifically, Tibbs states that Mack and Rego retaliated against Tibbs for his filing of Grievance 64173 by entering his cell holding area and destroying some of his property.  Id. at 46-48, 60.  This property largely consisted of legal paperwork relating to this present action as well as paperwork regarding Tibbs's administrative appeal of the disciplinary report that Samuels had filed after Tibbs allegedly headbutted her.  Id. at 46-48; D. 127-1 at 154.  It also contained Tibbs's address book, photos, cosmetics, stamps, envelope paper and a calendar.  D. 14 ¶¶ 46-48; D. 127-1 at 154.  Defendants argue that Tibbs cannot meet the "but for" burden required to demonstrate that his property was destroyed for no other reason than in retaliation for his filing the grievance.  D. 126 at 7.  The Court agrees.  In an affidavit, Rego stated that Tibbs's property was accidentally destroyed.  D. 127-1 at 62-63.  Tibbs noted in his deposition that it is "very well possible" that he accidentally left his property out in his cell and that one of the DOC workers mistakenly discarded it.  D. 127-1 at 23-24.  Tibbs has presented no evidence to counter the facts put forth by the Defendants.  Thus, as a matter of law, Tibbs cannot meet the "but for" requirement.  Furthermore, Tibbs did not respond to Defendants' arguments concerning Mack and Rego.  Defendants "ha[ve] properly supported [their] motion for summary judgment" thereby causing "the burden [to] shift[] to the

nonmoving party [i.e. Tibbs], with respect to each issue on which he has the burden of proof, to demonstrate that a trier of fact reasonably could find in his favor." Hodgens v. General Dynamics Corp., 144 F.3d 151, 158 (1st Cir. 1998). Tibbs has failed to meet this burden. Accordingly, the Court ALLOWS summary judgment in favor of Mack and Rego as to this retaliation claim.[4]

### 2.    Count XI: Conspiracy to Violate Civil Rights

To prove a civil conspiracy claim under 42 U.S.C. § 1983, a plaintiff must establish that (1) the defendant was involved in a civil conspiracy that (2) resulted in the plaintiff being deprived of a constitutional right. Nieves v. McSweeney, 241 F.3d 46, 53 (1st Cir. 2001); Landrigan v. City of Warwick, 628 F.2d 736, 742 (1st Cir. 1980); Diaz–Morales v. Rubio–Paredes, 170 F. Supp. 3d 276, 289 (D.P.R. 2016). To demonstrate involvement in a civil conspiracy, the plaintiff must show:  (1) "a common design or an agreement, although not necessarily express, between two or more persons to do a wrongful act"; and (2) "proof of some tortious act in furtherance of the agreement." Aetna Cas. Sur. Co. v. P & B Autobody, 43 F.3d 1546, 1564 (1st Cir. 1994); see Therrien v. Hamilton, 849 F. Supp. 110, 115 (D. Mass. 1994). "[T]he agreement that rests at the heart of a conspiracy is seldom susceptible of direct proof:  more often than not such an agreement must be inferred from all the circumstances." Earle v. Benoit, 850 F.2d 836, 843 (1st Cir. 1988); see Sepulveda v. UMass Corr. Health, Care, 160 F. Supp. 3d 371, 388 (D. Mass. 2016).

First, Tibbs claims that Samuels, Marrone and Roach conspired to cover up his beating and that such beating was intended to intimidate and retaliate against him for filing a grievance against Samuels. D. 14 ¶¶ 58-59. As to the first element, a showing that an agreement existed between Samuels, Marrone and Roach to act in furtherance of the retaliation against Tibbs is necessary.

---

[4] Defendants also argue that the Court should dismiss the retaliation claim against Stork. D. 126 at 7-8. Tibbs, however, did not assert a retaliation claim against Stork. Tibbs asserted retaliation claims solely against Samuels, Roach, Marrone, Rego and Mack. D. 14 ¶¶ 57-62.

Aetna Cas. Sur. Co., 43 F.3d at 1564.  Like the underlying retaliation claim, the disputed facts here

warrant the denial of summary judgment as to this conspiracy claim.  While Roach and Marrone

state that Samuels did not coach them on how to write the incident reports, D. 127-1 at 43, 47,

Tibbs claims he heard Samuels do just that.  D. 136 ¶ 31.  Tibbs's account of what he saw and

heard is sufficient to raise a disputed issue of material fact about what transpired on February 12,

2013.  See Evicci v. Baker, 190 F. Supp. 2d 233, 241 (D. Mass. 2002) (denying summary judgment

where an inmate relied upon personal knowledge to allege that correctional officers conspired to

"cover up [his] beating").

By contrast, the Court must dismiss Tibbs's conspiracy claims against Stork, DeMoura and

Borges.  The undisputed facts show that neither DeMoura nor Borges authored any reports or

statements about Tibbs, nor did either of them present testimony at his disciplinary hearing.  D.

127-1 at 70-72, 131-34.  Additionally, Tibbs makes no claim that either officer filed false reports

or statements or testified falsely.  DeMoura, as disciplinary officer, merely reviewed the

disciplinary report referred to him and, based upon what was written in the report, assigned the

report a number of offenses against Tibbs.  Id. at 131-34.  The only mention of DeMoura and

Borges in the amended complaint is a vague allegation that "due to defendants Sanderson,

DeMoura, Reilly and Borges conspiring with other unknown persons and each other to [withhold]

the evidence until the eleventh hour, Mr. Tibbs was unable to learn the names of witnesses, and

reserved the right to supplement the witness list upon receipt of the evidence/discovery."  D. 14 ¶

40.  Still now, after discovery, Tibbs has not produced any evidence that supports this conspiracy

claim against DeMoura and Borge.  Similarly, Tibbs has not produced evidence has been produced

that demonstrates that Stork took any part in the purported attempt to retaliate against Tibbs.  While

Tibbs alleges Stork failed to investigate Grievance 64173 properly and instead told Samuels about

the grievance, Id. ¶¶ 18-23, nothing has been presented to the Court to support these conclusory assertions.  For all of these reasons, the Court ALLOWS summary judgment as to the conspiracy claims against Stork, DeMoura and Borges.

### B.        Eighth Amendment Claims (Counts III & IV)

Tibbs' Eighth Amendment claims against Samuels and Marrone also stem from the February 12, 2013 altercation.  D. 127-1 at 101.  For the following reasons, the Court DENIES summary judgment as to these claims.

Use of force inflicted on an inmate by a prison official is considered "excessive" if applied "maliciously and sadistically to cause harm;" however, such force is not considered "excessive" if applied "in a good-faith effort to maintain or restore discipline."  Wilkins v. Gaddy, 559 U.S. 34, 37 (2010) (internal quotation mark and citation omitted).  In determining a prison official's motivation for using force against an inmate, the Court may consider the following factors:  (1) "the extent of injury suffered by [the] inmate"; (2) "the need for application of force" under the circumstances; (3) "the relationship between that need and the amount of force used"; (4) "the threat reasonably perceived" by the official; and (5) "any efforts made to temper the severity of a forceful response."  Hudson v. McMillian, 503 U.S. 1, 7 (1992) (internal quotation marks and citations omitted).  Still, corrections officers "should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security,"  Whitley v. Albers, 475 U.S. 312, 321-22 (1986) (internal quotation mark and citation omitted),[5] and the Court must keep in mind that "[t]he 'reasonableness' of a particular use of force must be judged from the perspective

---

[5] The Whitley Court added, however, that such "deference . . . does not insulate from review actions taken in bad faith and for no legitimate purpose."  Whitley, 475 U.S. at 322.

of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham v.

Connor, 490 U.S. 386, 396 (1989) (citation omitted).  Indeed, "[n]ot every push or shove, even if

it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's

constitutional rights." Hudson, 503 U.S. at 9 (internal quotation marks and citation omitted).

The Defendants here argue that the force used upon Tibbs was in accordance with DOC

regulations.  D. 126 at 10.  Specifically, they maintain that for the reasons permitted under 103

C.M.R. § 505.00 et seq. (2009), Samuels's and Marrone's actions during the February 12th

altercation were reasonable and constitutionally permissible.   The regulation relied upon by

Samuels and Marrone provides that:

> [a]n employee may use reasonable force when it is necessary to: . . . (b) prevent an
> act which could result in the death or serious bodily injury to himself/herself or
> another person; (c) defend himself/herself or another against physical assault; (d)
> prevent significant damage to property; (e) prevent or control a riot or disturbance;
> (f) move an inmate who has refused a proper order by an employee; . . . (i) preserve
> the overall order and security of the institution; and (j) preserve the safety of any
> employee, inmate or visitor.

103 C.M.R. § 505.07(1).  The Defendants urge that correction officers are "not required to gamble

with their personal safety," Commonwealth v. Robbins, 407 Mass. 147, 152 (1990), and that

"[u]nless it appears that the evidence, viewed in the light most favorable to [Tibbs], will support a

reliable inference of wantonness in the infliction of pain . . . the case should not go to the jury."

Whitley, 475 U.S. at 322.  In other words, so long as Samuels and Marrone were in a situation

where their safety was at stake and their response comported with the applicable regulations, then

the Court should grant summary judgment.

The Defendants contend that the undisputed facts show that Tibbs headbutted Samuels on

February 12th and that he was unprovoked in doing so.  D. 126 at 11.  They point the Court to

affidavits filed by Samuels and Marrone, as well as to the incident and disciplinary reports that

were filed immediately after this incident, to support their position.  D. 127-1 at 36, 46, 101, 105-06.  Because Tibbs's actions put Samuels's and Marrone's safety as risk, Defendants continue, both officers were authorized to use force pursuant to the regulations, 103 C.M.R. § 505.07(3)(a).  D. 126 at 11.  Tibbs, however, has put forth sufficient evidence to cast doubt on Samuels's and Marrone's explanation of the events that occurred that day.  Tibbs alleges that Samuels had previously made sexually suggestive advances towards him, advances that he had formally complained about on January 31st, less than two weeks before the February 12th altercation, and that his rejection of those advances angered the officer.  D. 138 at 2.  Upon his rejection, Tibbs claims that Samuels threatened that if she "has anything to do with it," Tibbs would not be getting out of prison anytime soon and would set him up to "get a new case."  D. 136 ¶ 4.  Moreover, Tibbs denies that he headbutted Samuels and further attests that he heard Samuels instructing the other two officers about how to write their reports to cover up their attack on him.  Id. ¶¶ 32, 34.

The Defendants make much of the fact that Tibbs did not sustain any injuries after the incident.  D. 126 at 12.  They point to an incident report filed by Nurse Hanula that reads, "[i]nmate stated he did not want to be evaluated.  No visible injuries noted."  D. 127-1 at 119.  But force by a prison official may be found "excessive" even where no "significant injury" resulted.  Hudson, at 7-9 (explaining that because the court weighs various factors to determine whether force was "excessive," "[t]he absence of serious injury is . . . relevant to the Eighth Amendment inquiry[] but does not end it").  And here, viewing the evidence in the light most favorable to Tibbs, he has at least rebutted the sworn assertions of the DOC officers.  If no incident whatsoever preceded Samuels's and Marrone's attack on Tibbs (i.e., that Tibbs' conduct was not posing a danger to the officers' security)—as Tibbs claims—then any physical attack to which he was subjected would,

by its very nature, be excessive.  If a jury credits Tibbs' statements, it could find that the facts here amount to the use of excessive force in violation of the Eighth Amendment.

For all of these reasons, the Court DENIES summary judgment as to Counts III and IV.

### C.     Failure to Protect Claims (Counts V & X)

Tibbs brings failure to protect claims against Spencer, Saba, Stork, Roach and Marrone. The primary issue over which the parties disagree is whether the Defendants were deliberately indifferent to Tibbs's safety.  D. 126 at 12-14; D. 135 at 20-21.  "A prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment." Farmer v. Brennan, 511 U.S. 825, 828 (1994); see Chao v. Ballista, 772 F. Supp. 2d 337, 355 n.11 (D. Mass. 2011).  To prove "deliberate indifference" the inmate must demonstrate that the official "knew of and disregarded an excessive risk to [the] inmate['s] health or safety." Messere v. Clarke, No. CV 11-11705-MLW, 2015 WL 5609959, at *6 (D. Mass. Sept. 22, 2015) (citing Farmer, 511 U.S. at 837).  The official must have:  (1) been aware of facts from which a reasonable person could infer that "a substantial risk of serious harm" existed; and (2) actually drawn that inference. Farmer, 511 U.S. at 837; see Burrell v. Hampshire Cty., 307 F.3d 1, 8 (1st Cir. 2002).  Mere knowledge of facts that objectively demonstrate "a substantial risk of serious harm" without actual subjective awareness of such harm is insufficient.  Farmer, 511 U.S. at 838 (holding that "an official's failure to alleviate a significant risk that he should have perceived but did not" does not amount to a violation of the Eighth Amendment).  However, it is unnecessary that the officer be capable of predicting the precise manner in which the harm would arise, id. at 843-44, or the form it would take, Calderón-Ortiz v. LaBoy-Alvarado, 300 F.3d 60, 65 (1st Cir. 2002).

Ultimately, whether the official had the requisite objective and subjective knowledge of "a substantial risk of serious harm" is "a question of fact" that may be inferred from circumstantial

evidence. <u>Farmer</u>, 511 U.S. at 842. Furthermore, "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." <u>Calderon-Ortiz</u>, 300 F.3d at 65 (internal quotation mark and citation omitted). "For example, if an Eighth Amendment plaintiff presents evidence showing that a substantial risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus must have known about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk." <u>Farmer</u>, 511 U.S. at 842-43 (internal quotation marks and citation omitted).

First, Tibbs suggests in his complaint that Stork showed deliberate indifference to his risk of harm by failing to investigate properly or resolve Grievance 64173, which detailed Tibbs's allegations that Samuels made sexual advances toward him and threatened him when he rejected those advances. D. 14 ¶¶ 20-23. Rather than adequately handle the grievance, Tibbs asserts that Stork informed Samuels that Tibbs had filed a grievance against her. <u>Id.</u> ¶¶ 22-23. This, he continues, led to Samuels's and Marrone's assault on Tibbs on February 12, 2013. <u>Id.</u> But Tibbs has failed to present any evidence that such communication between Stork and Samuels actually took place. Tibbs argues that Samuels had a history of retaliatory practices, D. 14 ¶ 17, and points the Court to the deposition of one of Tibbs's fellow inmates to vouch for this fact, D. 137 at 9. He also directs the Court to Stork's admission that grievances had been filed against Samuels in the past. D. 137 at 78. Tibbs presents nothing more to support his argument. None of Tibbs's alleged facts shows that Stork failed to protect him—they do not provide the vital link necessary to show a connection between Stork's conduct (or lack thereof) and the alleged attack on Tibbs. Stork, on the other hand, attests that he never told Samuels of the grievance that Tibbs had filed against her.

D. 127-1 at 66.  Thus, for the same reasons outlined above pertaining to Tibbs's retaliation claim against Stork, the record does not reveal evidence that might allow a reasonable jury to find Stork liable for failure to protect.  Accordingly, summary judgment is GRANTED as to Counts V and X against Stork.

Tibbs also brings Eighth Amendment claims against Spencer, the former Commissioner of the DOC, and Saba, the Superintendent of MCI-Cedar Junction.  D. 14 ¶¶ 75-77, 101-105.  He alleges that Spencer and Saba are liable as supervisors who allowed correctional officers to engage in unconstitutional practices.  Id.  While a correctional supervisor cannot be held liable for the "deliberate indifference" of his subordinate officials, he may be found liable for a violation of the Eighth Amendment on the basis of his own acts or omissions demonstrating "deliberate indifference."  Sanchez v. Pereira-Castillo, 590 F.3d 31, 49 (1st Cir. 2009).  To prove supervisory liability, an inmate must show that the supervisor either:  (a) was a "direct participant" in the infringement of the inmate's civil rights; or (b) supervised, trained or hired the culpable subordinate official with "deliberate indifference" toward the possibility that deficient performance of this task would eventually result in a civil rights violation.  Id.  Thus, there must be "an affirmative link" between the supervisor's actions or omissions and the infringement of the inmate's civil rights.  Britton v. Maloney, 901 F. Supp. 444, 453 (D. Mass. 1995); Perry v. Dickhaut, 125 F. Supp. 3d 285, 299 (D. Mass. 2015) (noting that if "there is no underlying conduct that was itself violative of a plaintiff's constitutional rights, the assertion that the supervisors are also liable fails") (internal quotation marks and citation omitted).  Such a causal link may be established by showing that the supervisor was "on notice" of ongoing civil rights violations by the official and "fail[ed] to take corrective action, say, by better training or closer oversight."  Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 582 (1st Cir. 1994).  Knowledge of an

official's extensive history of civil rights violations serves as constructive notice of his ongoing civil rights violations.  Id.  Ultimately, the supervisor must have been grossly negligent in his failure to act.  Febus-Rodriguez v. Betancourt-Lebron, 14 F.3d 87, 91 (1st Cir. 1994); Britton, 901 F. Supp. at 453.

Here, because Tibbs does not claim that Spencer and Saba directly participated in the infringement of his constitutional rights, Tibbs must demonstrate that they either supervised, trained or hired subordinates with deliberate indifference that those employees would likely contribute to a deprivation of Tibbs's civil rights or that they were fully aware of, and deliberately indifferent to, a grave risk of harm to Tibbs's safety.  Tibbs has failed to do so.  Indeed, he has not responded to the motion for summary judgment as to these particular defendants.  Consequently, he has waived his opportunity to object to the motion and summary judgment is granted as to Counts V and X against Spencer and Saba.  See Grenier v. Cyanamid Plastics, Inc., 70 F.3d 667, 678 (1st Cir.1995) (holding that "[i]f a party fails to assert a legal reason why summary judgment should not be granted, that ground is waived" (internal quotation mark and citation omitted)); see also Parker v. City of S. Portland, No. CIV 06-129-P-S, 2007 WL 1468658, at *24 (D. Me. May 18, 2007) (recognizing that a party's failure to respond to a motion for summary judgment on a particular claim "effectively conced[es] that [the claim] cannot be maintained").  Even if Tibbs had properly opposed summary judgment here, however, he has presented no admissible evidence that demonstrates either Spencer or Saba had any awareness that Tibbs was at risk of harm by Samuels or other correction officers prior to the February 12, 2013 altercation.  As such, the claims against them cannot survive summary judgment.  See Alsina-Ortiz v. Laboy, 400 F.3d 77, 81-82 (1st Cir. 2005) (holding that correctional administrators who had no knowledge of a continuing pattern of guards failing to report inmates' medical needs could not be held liable under § 1983).

Therefore, the Court ALLOWS summary judgment as to Counts V and X against Spencer and Saba.

By contrast, the Court will not dismiss the § 1983 claim against Roach and Marrone for failure to protect.  According to Tibbs's affidavit, Marrone and Roach were responsible for transporting Tibbs from his cell to the medical triage unit. D. 136 ¶ 24.  Once at the medical unit, Roach and Marrone continued to monitor Tibbs during the procedure conducted by the medical staff. Id. Samuels, who was working on the upper level of Ten Block, made her way to the medical unit while Tibbs was still there.  Id. ¶ 25.  She and Roach briefly spoke before she exited the triage unit.  Id.  Shortly thereafter, Samuels returned and again called Roach over to her.  Id.  After this conversation, Roach and Samuels switched duty assignments, with Roach leaving to conduct showers and Samuels staying in the triage unit to oversee Tibbs.  Id.  Having switched spots with Roach is what gave Samuels the opportunity to attack Tibbs only moments later.  Id. ¶¶ 25, 27. During the alleged attack, Tibbs claims Marrone held him and allowed Samuels to beat him.  Id. ¶ 27.  After the attack, Tibbs claims Roach and Marrone both filed false incident reports to conceal the truth about what had transpired.  Id. ¶¶ 32, 34.  Defendants counter that they had no knowledge of the tension that existed between Samuels and Tibbs, and that they did not file false reports.  D. 127-1 at 41-42, 46-47.

Given the temporal and causal connection between the conversation Samuels and Roach had, their switching of duties, the alleged attack on Tibbs by Samuels and Tibbs's testimony that Marrone held Tibbs while Samuels beat him, there is at least a question of fact to allow Tibbs's claim against Roach and Marrone to go to a jury.  That is, "a factfinder may conclude that [Roach and Marrone] knew of a substantial risk from the very fact that the risk was obvious." Calderon-

Ortiz, 300 F.3d at 65.  The Court, therefore, DENIES summary judgment as to Count V against Roach and Marrone.

### D.        Procedural Due Process Claim (Count XII)

Tibbs alleges violations of his procedural due process rights with regard to Disciplinary Report 274610.  D. 14 ¶¶ 57-62.  "Prisoners are entitled to the protections of the Due Process Clause of the 14th Amendment and therefore 'may not be deprived of life, liberty, or property without due process of law.'"  Linton v. O'Brien, 142 F. Supp. 3d 215, 218 (D. Mass. 2015) (quoting Wolff v. McDonnell, 418 U.S. 539, 556 (1974)).  When an inmate brings a due process claim, the court must ask:  (1) "whether there exists a liberty or property interest of which [the inmate] has been deprived"; and, if so, (2) "whether the procedures followed by the State were constitutionally sufficient."  Id. (quoting Swarthout v. Cooke, 562 U.S. 216, 219 (2011)) (internal quotation mark omitted); see Pérez-Acevedo v. Rivero-Cubano, 520 F.3d 26, 30 (1st Cir. 2008); Felton v. Lincoln, 429 F. Supp. 2d 226, 240 (D. Mass. 2006).

A liberty interest in avoiding particular conditions of confinement may arise out of state policies or regulations but only when the challenged conditions impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."  Wilkinson v. Austin, 545 U.S. 209, 222-23 (2005) (quoting Sandin v. Conner, 515 U.S. 472, 483-84 (1995)) (internal quotation mark omitted).  "Whether a particular restraint imposes an atypical and significant hardship depends, in turn, on its duration and degree."  Torres v. Comm'r of Corr., 427 Mass. 611, 618 (1998) (internal quotation marks and citation omitted).

Even assuming such a liberty interest exists, see Hinds v. Pepe, No. 15-CV-10073-LTS, 2016 WL 1643742, at *3 (D. Mass. Apr. 25, 2016), there is no procedural due process violation where, prior to such confinement, an inmate receives:  "(1) advance written notice of the

disciplinary charges; (2) an opportunity, when consistent with institutional safety and correctional goals, to call witnesses and present documentary evidence in his defense; and (3) a written statement by the factfinder of the evidence relied on and the reasons for the disciplinary action." Felton, 429 F. Supp. 2d at 241 (internal quotation mark and citation omitted); Duclerc, 2012 WL 6615040, at *8.

Here, the undisputed record shows that Defendants have met all of these factors. As a result of the altercation that occurred on February 12, 2013, Samuels issued to Tibbs Disciplinary Report 274610. D. 127-1 at 101. This report was reviewed by Samuels's supervisor, Edward Mack, and the shift commander, Edwin Doolin. Id. at 101-102. The report was then referred to Disciplinary Officer Kurt DeMoura who assigned the report a multitude of offenses. Id. at 101, 133. Because of the nature of the offenses charged in the disciplinary report and the potential for a sentence to the DDU, the matter was referred for a DDU hearing. Id. at 79. On April 24, 2013, Tibbs was given notice of a hearing date. Id. at 137. Pursuant to 103 C.M.R. § 430.11(1), Tibbs also completed a Request for Representation and/or Witnesses Form. Id. at 138. In this form, Tibbs requested legal representation and requested as a witness an unknown person who was in the law library at Ten Block. Id. Tibbs also completed an Evidence Requested by Inmate Form pursuant to 103 C.M.R. § 430.11(1), id. at 139, on which he requested as evidence "all automatic discovery, all incident reports and use of force reports of 02/12/2013 relating to Jerome Tibbs, all photos of any alleged injuries, all medical reports of Jerome Tibbs, C.O. Roach and Rebekah Samuels, from 02/12/13, all video of [T]en [B]lock from 8:00 AM to 8:45 PM, log records for [T]en [B]lock showing what time Edward M. Mack signed into work. . . ." Id. In response to these requests, Tibbs received an Evidence Produced to Inmate Form, written by Sergeant Sanderson pursuant to 103 C.M.R. § 430.11(1). Id. at 19, 140. Sanderson produced to Tibbs the

disciplinary reports regarding the incident, as well as numerous incident reports that gave accounts of what had transpired during the altercation.  Id.  Sergeant Sanderson, however, denied Tibbs's request for photos and video because they did not exist.  Id.  She also denied Tibbs's request for the February 12, 2013 log records from Ten Block showing what time Edward M. Mack signed in to work, as his name was not listed on the log, and she denied Tibbs's witness request, as she was unable to identify the witness.  Id.

At the hearing, Samuels testified, id. at 20, 144, and Tibbs was able to cross-examine her, id. at 52.  Tibbs requested at the hearing that Nurse Spendlove, Roach and Mercado testify, but this request was denied because Tibbs had never previously requested that they present testimony. Id. at 142.  Tibbs was allowed, however, to submit an affidavit from a fellow inmate, as well as his own four-page summary of the incident.  Id. at 52, 56.  Tibbs chose not to testify on his own behalf.  Id. at 20.  Following the hearing, SHO Reilly provided Tibbs with a written statement as to the evidence relied on and reasons for the disciplinary action.  Id. at 142-43.  Tibbs requested additional time to file an appeal of SHO Reilly's findings and sanction on Disciplinary Report 274610, and he was granted an additional fifteen days by Deputy Commissioner Peter Pepe.  Id. at 22, 145.  A month and a half after Tibbs submitted his final appeal of the disciplinary report, Pepe denied the appeal .  Id. at 153.

While Tibbs is dissatisfied with the outcome of the disciplinary hearing, the disciplinary process itself did not strip Tibbs of any procedural due process rights.  Tibbs was given notice of the hearing; he was provided the opportunity to present witnesses and evidence—his failure to properly request additional witnesses does not change this fact; he was provided a summary of the findings that informed the factfinder's decision; and he was given the opportunity to appeal.  See Wolff, 418 U.S. at 563-67 (1974).  Still, "even if a plaintiff's challenges do not support a due

process claim, a plaintiff has a remedy for failure to adhere to regulations in prison disciplinary proceedings under G.L. c. 249, § 4." Howell v. O'Malley, No. CIV.A. 09-11407-DJC, 2011 WL 3563159, at *6 (D. Mass. Aug. 12, 2011) (internal quotation marks and citations omitted). Such a procedural challenge must be brought as "an action in the nature of certiorari." Martin v. Clavin, No. CIV. A. 08-11971-MBB, 2010 WL 3607079, at *8 (D. Mass. Sept. 9, 2010). However, where such a claim is raised as part of a complaint seeking other forms of relief, the court will treat it as an action in the nature of certiorari. Messere v. Clark, No. CA 11-11705-MLW, 2013 WL 3289104, at *2 (D. Mass. June 27, 2013). Judicial review of such a decision is limited to assessing whether "the record as a whole . . . contains substantial evidence to support the prison disciplinary board's decisions." Shabazz v. Cole, 69 F. Supp. 2d 210, 218-19 (D. Mass. 1999) (internal quotation marks and citation omitted); see Anderson v. Chamberlain, 134 F. Supp. 2d 156, 158-59 (D. Mass. 2001). Evidence is considered "substantial" if "a reasonable mind might accept [it] as adequate to support [the] conclusion." Shabazz, 69 F. Supp. 2d at 218 (internal quotation mark and citation omitted). The purpose of G.L. c. 249, § 4 "is to provide a remedy, where none would otherwise exist, if necessary to avoid manifest injustice." Drayton v. Comm'r of Corr., 52 Mass. App. Ct. 135, 140 (internal quotation mark and citation omitted).

But there is nothing here to suggest that the adjudicatory proceeding itself resulted in manifest injustice. While Tibbs claims the hearing officers—Reilly and Sanderson—were biased, D. 14 ¶ 115, Tibbs never questioned the impartiality of the two hearing officers at any point prior to the instant action. D. 127-1 at 51-52, 56. He has also not submitted any evidence that would support his conclusory allegation. While it may be true that Samuels was not placed under oath before giving her testimony, that one fact by itself is not enough to reach the level of "manifest injustice." To the extent that Tibbs challenges the sufficiency of the evidence presented during

the hearing, the Court also finds Tibbs fails to maintain a claim under G.L. c. 249, § 4. "Review under G.L. c. 249, § 4, is limited to correcting substantial errors of law that affect material rights and are apparent on the record. . . . Since review is confined to the record and is for the purpose of correcting legal error, the inquiry about the presence or absence of genuine issues of material fact, germane to summary judgment procedure, is inappropriate. Therefore, [the Court] need not be concerned with summary judgment principles. [The Court] need only inquire whether the commission's decision was legally tenable and supported by substantial evidence on the record as a whole." Gloucester v. Civil Serv. Comm'n, 408 Mass. 292, 297 (1990) (internal quotation marks and citations omitted). As noted, the hearing officer heard testimony from Samuels, whom Tibbs was allowed to cross-examine; he received the disciplinary report and the incident reports, Tibbs's affidavit and an affidavit from another inmate in support of Tibbs. Consequently, the Court ALLOWS summary judgment as to all of Tibbs' due process allegations encompassed in Count XII.

### E.     MCRA Claim (Count XIII)

Tibbs claims Samuels, Roach and Marrone violated his rights under the MCRA by filing dubious disciplinary and incident reports to explain the alleged attack on him perpetrated by Samuels on February 12, 2013. To prove a violation of the Massachusetts Civil Rights Act ("MCRA"), a plaintiff must show: "(1) his exercise or enjoyment of rights secured by the constitution or laws of either the United States or the Commonwealth of Massachusetts (2) has been interfered with, or attempted to be interfered with, . . . (3) . . . by threats, intimidation or coercion." Farrah ex rel. Estate of Santana v. Gondella, 725 F. Supp. 2d 238, 247 (D. Mass. 2010); see Stone v. Caswell, 963 F. Supp. 2d 32, 37 (D. Mass. 2013). For purposes of the MCRA, "threat" means "intentional exertion of pressure to make another fearful or apprehensive of injury or harm;"

"intimidation" means "putting [a person] in fear for the purpose of compelling or deterring [his] conduct"; and "coercion" means "application to another of such force, either physical or moral, as to constrain him to do against his will something he would not otherwise have done." Planned Parenthood League of Mass., Inc. v. Blake, 417 Mass. 467, 474 (1994). A threat to file false disciplinary charges as part of a broad scheme of harassment is a "threat" for MCRA purposes. Shabazz, 69 F. Supp. 2d at 202. "In order to establish a 'scheme of harassment' there must be some evidence of animus against the plaintiffs or their project and an attempt to thwart the project through adverse administrative action unrelated to [] legitimate concerns." Murphy v. Town of Duxbury, 40 Mass. App. Ct. 513, 518 (1996).

In establishing a claim for violation of the MCRA, a Plaintiff cannot rely on the same conduct "as both the constitutional violation and the evidence of threats, intimidation, or coercion." Santiago v. Keyes, 890 F. Supp. 2d 149, 159 (D. Mass. 2012); see Stone, 963 F. Supp. 2d at 37; Johnson v. Charbonnier, No. 13-CV-13301-ADB, 2015 WL 8215892, at *5 (D. Mass. Dec. 8, 2015) (holding that the plaintiff "cannot rely on the alleged use of excessive force . . . as both evidence of the constitutional violation and of the threats, intimidation, and coercion required under the MCRA"). "To hold otherwise would . . . be at odds with legislative intent and render some of the language of the MCRA superfluous." Johnson, 2015 WL 8215892, at *5; see Goddard v. Kelley, 629 F. Supp. 2d 115, 128-29 (D. Mass. 2009) (acknowledging that it would be irrational to find the defendant police officers "assaulted the plaintiff in order to cause [him] to give up his right to be free from excessive force" and concluding that "[s]uch a construction would torture the statute well beyond its plain meaning").

First, Defendants claim that "Tibbs cannot factually support an actual deprivation of any constitutional or statutory rights." D. 126 at 36. Next, they maintain that even if Tibbs could

demonstrate he was deprived of a constitutional right, his claim must still fail because he cannot show that the deprivation of that right was accomplished by threats, intimidation or coercion.  Id. Finally, they suggest that Defendants' alleged actions had virtually no effect on Tibbs because he was able to file grievances, appeal the disciplinary reports and pursue the instant legal action in this Court.  Id.

To support their argument, Defendants note that "Tibbs has no constitutionally guaranteed immunity from false or fabricated disciplinary accusations."  Id. at 37.  So long as he has been afforded the requisite process hearing he cannot sustain a subsequent cause of action under 42 U.S.C. 1983 for allegations of improper or erroneous disciplinary charges by prison officials.  Id. Defendants are correct about this legal tenet, see Freeman v. Rideout, 808 F.2d 949, 951 (2d Cir. 1986) (holding that "[t]he prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest").  Tibbs's protected constitutional interest, however, does not lie in any supposed right to be free from false disciplinary charges.  Rather, his interest lies in his right not to be deterred from filing grievances reporting allegations of DOC staff impropriety and not to be subjected to excessive use of force.  As noted above, these protections are rights guaranteed by the First and Eighth Amendments.

Thus, whether Tibbs received due process at the disciplinary hearing is certainly not fatal to his MCRA claim.  For the reasons stated in both the retaliation and excessive force sections of this opinion, there is at least a factual dispute as to whether Samuels, Roach and Marrone have interfered with Tibbs's enjoyment of his First Amendment and Eighth Amendment rights. Consequently, Tibbs need only rebut Defendants' showing such that a  reasonable jury could find that Samuels, Roach and Marrone engaged in some threat, intimidation or coercion outside of the

directly alleged violations of those rights.  The filing of a false disciplinary report against Tibbs to provide cover for Samuels's actions certainly satisfies this element, given that such conduct does not by itself constitute the constitutional deprivations alleged.  See Shabazz, 69 F. Supp. 2d 177, 202 (D. Mass. 1999).  Tibbs has provided his own testimony that the reports were, indeed, untrue. D. 136 ¶¶ 32, 34.  He has also provided evidence to suggest a "scheme of harassment" by Samuels existed.  That is, Tibbs has presented enough to infer that animus existed between himself and Samuels and that Samuels—and Marrone and Roach at her instruction—engaged in adverse administrative actions in an attempt to harm him. Id. ¶¶ 4, 31-32, 34.  In light of the foregoing, the Court DENIES summary judgment as to the MCRA claim.

## F. Qualified Immunity Defense

"Qualified immunity shields government officials performing discretionary functions from civil [suits] for money damages when their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Nereida-Gonzalez v. Tirado-Delgado, 990 F.2d 701, 704 (1st Cir. 1993) (internal quotation marks and citation omitted); see Pearson v. Callahan, 555 U.S. 223, 231 (2009) (clarifying that "qualified immunity is an immunity from suit" (internal quotation mark and citation omitted)).  In determining whether a government official is entitled to qualified immunity, the First Circuit considers:  "(1) whether the claimant has alleged the deprivation of an actual constitutional right; (2) whether the right was clearly established at the time of the alleged action or inaction; and (3) if both of these questions are answered in the affirmative, whether an objectively reasonable official would have believed that the action taken violated that clearly established constitutional right." Shaheed-Muhammad v. Dipaolo, 393 F. Supp. 2d 80, 94 (D. Mass. 2005) (quoting Starlight Sugar, Inc. v. Soto, 253 F.3d 137, 141 (1st Cir. 2001)); see Mihos v. Swift, 358 F.3d 91, 102 (1st Cir. 2004) (establishing the

First Circuit's practice of addressing each issue sequentially).  Because qualified immunity is an affirmative defense, the defendant bears the burden of proving that the doctrine of qualified immunity applies.  <u>DiMarco-Zappa v. Cabanillas</u>, 238 F.3d 25, 35 (1st Cir. 2001); <u>Lopez-Erquicia v. Weyne-Roig</u>, 106 F. Supp. 3d 279, 281 (D.P.R. 2015).  A defendant who pleads qualified immunity as an affirmative defense is entitled to summary judgment if "discovery fails to uncover evidence sufficient to create a genuine issue as to whether the defendant in fact committed [a violation of clearly established statutory or constitutional rights]."  <u>Mitchell v. Forsyth</u>, 472 U.S. 511, 526 (1985).

Here, Defendants assert qualified immunity and move for summary judgment on all Tibbs's claims based upon this defense.  D 126, at 38-39.  The sole allegation they make in support of this alleged defense is that "Tibbs has failed to produce any evidence of a constitutional violation."  <u>Id.</u>  However, as previously discussed, the Court finds that there is a genuine dispute of material fact as to whether Defendants violated Tibbs's First and Eighth Amendment rights.  Furthermore, these asserted violations of constitutional rights were "clearly established" at the time of the Defendants' alleged misconduct.  <u>See, e.g.</u>, <u>Maraj v. Massachusetts</u>, 836 F. Supp. 2d 17, 26 (D. Mass. 2011) (noting that "[a]llegations of excessive force brought by inmates against corrections officers are traditionally adjudicated under the rubric of the Eighth Amendment"); <u>Ayotte v. Barnhart</u>, 973 F. Supp. 2d 70, 82 (D. Me. 2013) (concluding that "an inmate's rights against retaliatory action by prison officials . . . is both clear and well-established").  Of note, the Defendants have failed to produce any evidence to show otherwise.  <u>See</u> <u>DiMarco-Zappa</u>, 238 F.3d at 35 (clarifying that this burden falls on the individual invoking the doctrine of qualified immunity).  Ultimately, because the Court finds there is a genuine dispute as to whether the Defendants violated such constitutional rights, there is necessarily a genuine dispute as to a

preliminary fact necessary to determine if an objectively reasonable person in the Defendants' position would have believed their actions or inactions violated such rights.  See Morales v. Ramirez, 906 F.2d 784, 787 (1st Cir. 1990) (reasoning that "[e]ven assuming for the sake of discussion that the right . . . was 'clearly established' in the operative time frame . . . , our consideration here of whether 'a reasonable official would [have] underst[oo]d that what he is doing violates' that right, . . . unavoidably calls into question whether *any* violation of the right occurred" (citation omitted) (alterations in original)).  Thus, whether the Defendants are entitled to qualified immunity depends upon a genuine dispute of material facts that must be resolved at trial.  See Rodriguez-Marin v. Rivera-Gonzalez, 438 F.3d 72, 83 (1st Cir. 2006) (stating that "factual questions, to the extent they are antecedent to this determination [of whether qualified immunity applies], must be determined by a jury").

## VI.    Conclusion

For the foregoing reasons, the Court ALLOWS IN PART and DENIES IN PART Defendants' motion for summary judgment, D. 124, as follows:

a.  ALLOWS the motion as to Count One (§ 1983 retaliation claim) against Rego and Mack but DENIES the motion as to Count One against the remaining Defendants.

b.  DENIES the motion as to Counts Three and Four (§ 1983 excessive force claims).

c.  ALLOWS the motion as to Count Five (§ 1983 failure to protect claim) against Stork, but DENIES the motion as to Count Five against the remaining Defendants.

d.  ALLOWS the motion as to Count Ten (§ 1983 claim) against Spencer and Saba.

e.  ALLOWS the motion as to Count Eleven (§ 1983 conspiracy claim) against Rego and Mack but DENIES the motion as to Count Eleven against the remaining Defendants.

f.  ALLOWS the motion as to Count Twelve (procedural due process claim).

g.   DENIES the motion as to Count Thirteen (MCRA claim).

**So Ordered.**

<u>/s/ Denise J. Casper</u>
United States District Judge